| | |
|---|---|
| MENDI BLUE | |
| Plaintiff, | No. 3:16-cv-1411 (MPS) |
| v. | |
| CITY OF NEW HAVEN | |
| Defendant. | |

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The plaintiff, Mendi Blue ("Ms. Blue"), filed this action challenging a decision by the City of New Haven ("the City") to terminate her employment as New Haven's Director of Development and Policy. In the operative complaint, Ms. Blue alleges retaliation in violation of Connecticut's "whistleblower" protection statute, violation of her federal and state free speech rights, breach of contract, and discrimination on the basis of race and color. ECF No. 43. The City has moved for summary judgment on all counts. ECF No. 77. For the reasons set forth below, the motion for summary judgment is GRANTED as to the federal free speech and breach of contract claims, and DENIED as to the retaliation, state free speech, and racial discrimination claims.

## I.    Facts

The following facts, which are taken from the parties' Local Rule 56(a) statements and supporting exhibits, are undisputed unless otherwise indicated.[1]

---

[1] The Plaintiff's Rule 56(a) statement is mis-numbered. It contains two paragraphs numbered "5" and two paragraphs numbered "16" while there are no paragraphs numbered "6" or "20." I have used the correct numbers in this opinion.

## A. Ms. Blue's Appointment to the Office of Development and Policy

Ms. Blue volunteered on Mayor Harp's mayoral campaign. ECF No. 79-1 at ¶ 2. After Mayor Harp was elected, she hired Ms. Blue to be New Haven's Director of Labor Relations on January 1, 2014. *Id*. at ¶ 3. A few months later, in May 2014, Mayor Harp appointed Ms. Blue to a newly-created position: Director of Office of Development and Policy ("ODP"). *Id*. at ¶ 7. The appointment was made pursuant to Section 4(a) of the Revised City Charter, *id*., which provides that "[t]he Mayor shall appoint a secretary to the Mayor and other employees in the Office of the Mayor, who shall serve under the direction of and subject to removal at the pleasure of the Mayor, *id*. at ¶ 4.

The Board of Alders ("BOA") is the legislative body of the City of New Haven, *id*. at ¶ 8, and voted to fund the ODP Director position, *id*. at ¶ 9. In approving the position, the BOA adopted an ordinance requiring the ODP Director to provide quarterly reports to the BOA regarding the City's progress in securing grant funding. *Id*. at ¶ 10. As ODP Director, Ms. Blue was also responsible for identifying, coordinating, and applying for grants. *Id*. at ¶ 11. In the course of this job, she was expected to work in partnership with the Mayor and department heads. *Id*.

Ms. Blue received a copy of the Employee Handbook and City policies at a new hire orientation held sometime within her first three months on the job. *Id*. at ¶ 5. The Employee Handbook's "disciplinary process" provision includes the following language:

> Normally, discipline will be administered in accordance with the principles of progressive discipline. Progressive discipline provides for increasingly serious disciplinary measures. However, the severity of any disciplinary action is dependent upon the nature of the offense.

> In some situations, employee behavior is so serious that immediate termination is warranted. If the City's investigation of the situation reveals that the employee committed

what it determines to be a serious offense, then termination without progressive discipline may be required.

*Id*. at ¶ 6.

## B. Ms. Okafor's Alleged Use of Unbid Grant Writing Services

Mayor Harp hired Martha Okafor ("Ms. Okafor") as the Community Services Administrator on May 28, 2014. *Id*. at ¶ 12. As the head of the community services administration, Ms. Okafor assumed the responsibility of trying to generate additional resources for her office. *Id*. at ¶ 13. On June 3, 2014, Mayor Harp sent a memo to all coordinators and department heads, requesting that they inform ODP (Ms. Blue's department) of all grant seeking, proposal writing, and fundraising-related activities within their departments." *Id*. at ¶ 14.[2] Shortly after she was hired, Ms. Okafor began contracting with Farnam Associates ("Farnam"), an outside consultant, for grant writing services. *Id*. at ¶ 16. Ms. Okafor was required to follow the procedures set forth in Article XV, § 1 (C) of the Revised City Charter when working with outside consultants. The relevant provision of the charter states:

> Whenever any work is necessary to be done, or any supply is needed, and the several parts of said work or supply shall together involve the expenditure of more than five thousand dollars ($5,000.00), or such other amount established by the Board of Alders by Ordinance, such work shall be done or supply acquired pursuant to written contract, under such regulations as the Board of Alders may establish by Ordinance. All such contracts shall be founded on sealed bids or proposals made in compliance with Public Notice published at least ten (10) Days before the time fixed for opening said bids or proposals. If the Purchasing Agent shall not deem it for the interest of the City to reject all bids, the Purchasing Agent shall award the contract to the lowest responsible bidder.

*Id.* at ¶ 19.

Ms. Blue became aware that Ms. Okafor was outsourcing grant writing services to Farnam without putting the work out to bid. *Id*. at ¶ 17. She soon began expressing concern to

---

[2] Ms. Blue testified that she authored the first draft of this memo, but did not know what changes had been made, if any, before Mayor Harp signed and distributed it.

Mayor Harp, and others in the administration, that Ms. Okafor was awarding grant writing contracts without going through the bidding process required by the City Charter. *Id*. at ¶ 18. Ms. Okafor was advised that she needed to work with the purchasing office to issue requests for proposals when utilizing outside consultants. *Id*. at ¶ 24. In addition, the purchasing agent held a training session for everyone in the City who had occasion to utilize outside contractors. *Id*. The parties disagree whether Ms. Okafor began to follow the procedures in 2016. *Id*. at ¶ 26. The City states that by the beginning of 2016, Ms. Okafor only retained Farnam's services after putting a work request out to bid, while Ms. Blue states that Ms. Okafor was still retaining Farnam without following the proper procedures. *Id*. Specifically, Ms. Blue states that a contract between the City and Farnam was executed retroactively on February 18, 2016 with an effective date of January 1, 2016, and that Farnam had been selected and had begun work before the contract was put out to bid. *Id*.

### C.  The Budget Dispute, BOA Meeting, and Memorandum

The City states that Mayor Harp issued a directive to her department heads and coordinators informing them that when she submits a proposed budget to the BOA, the time for lobbying in favor of a particular department is over, and they must support the budget before the BOA. *Id*. at ¶ 34. Ms. Blue states that the directive was not articulated "in an effective and official manner" and that that the only clear statement of this policy came in writing after her termination. *Id*. In any case, the City states that Ms. Blue knew that the Mayor expected all of her directors to support the budget once it was presented to the BOA. *Id*. at ¶ 38. While Ms. Blue testified that she generally knew about this policy, she also stated that the policy had not always been followed in the past. *Id*.

In January 2016, Ms. Blue spoke with Mayor Harp about adding two new positions for the Office of Development and Policy to the proposed budget. *Id*. at ¶ 27. On March 29, 2016, however, shortly before Ms. Blue was scheduled to speak to the BOA Finance Committee, she was informed that those two positions were not in the Mayor's budget. *Id*. at ¶ 28. At the meeting, the Alders questioned Ms. Blue about grants she had worked on and the money her office brought into the City. *Id*. at ¶ 29. The next day, Ms. Okafor testified before the BOA Finance Committee and was asked "how grants work in the city in its entirety." *Id*. at ¶ 30-31. Ms. Blue was not present during Ms. Okafor's testimony, but she listened to a recording of it and felt that it was her responsibility to respond to the BOA's inquiry. *Id*. at ¶ 31.

On April 7, 2016, Ms. Blue submitted an 11-page memo to the BOA. *Id*. at ¶ 32. In the memo, she requested funding for two new positions in her office, stating that "[t]hough these positions were not included in the proposed 2016-17 budget, I appeal to this Committee to fund these positions." *Id*. at ¶ 33. At the time she submitted this memo, she knew that the two positions were not in the Mayor's budget. *Id*. at ¶ 37. The memo also reported Ms. Okafor's practice of awarding grant writing contracts without a bidding process in violation of city rules. *See*, *e.g.*, Defendant's Ex. R at 5 (calling attention to Ms. Okafor's "violation of every city policy (formal or informal) related to the production of grants.").

### D. Ms. Blue's Termination

After submitting the memo, Ms. Blue was out of the office for almost two weeks, first attending a conference and then on vacation. ECF No. 79-1 at ¶ 41. A few days after returning to the office, Ms. Blue was terminated. *Id*. at ¶ 42 & 47. At the termination meeting, Mayor Harp read from a script. *Id*. at ¶ 43; Defendant's Ex. U. Mayor Harp stated that Ms. Blue had violated her trust, and that she had caused her embarrassment. *Id*. at ¶ 44. She further indicated that if Ms.

Blue had wanted to advocate for new positions, the time to do so was before the budget was submitted, and the request for new positions was a deliberate violation of the directive to speak with one voice. *Id*. She also stated that Ms. Blue had disrupted the operations of her office and the budget process. *Id*. The parties agree that Mayor Harp terminated Ms. Blue's employment for violating her trust and for "deliberately disobeying a directive that disrupted the operations of her office and the budget process." *Id*. at ¶ 47.

The City states that Mayor Harp did not indicate, at any point, that she was upset that Ms. Blue had complained about Ms. Okafor. *Id*. at ¶ 45. Ms. Blue testified that she could not recall exactly what the Mayor said she was upset about at the termination meeting. *Id*.

## II.     Legal Standard

Summary judgment is appropriate only when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In making that determination, a court must view the evidence in the light most favorable to the opposing party." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (internal quotation marks and citations omitted). "A fact is material when it might affect the outcome of the suit under governing law," and "an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal citations and quotation marks omitted). The moving party bears the burden "of showing that no genuine factual dispute exists . . . , and in assessing the record to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences" in favor of the non-moving party. *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir. 1995).

## III.     Discussion

**A. Retaliation for Reporting a Violation of Law (Count One)**

Conn. Gen. Stat. § 31-51m prohibits an employer from discharging, disciplining, or otherwise penalizing an employee because (1) the employee reported a violation or suspected violation of a law, regulation, or ordinance to a public body, or (2) the employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body. Conn. Gen. Stat. § 31-51m(b). This claim is analyzed under the *McDonnell Douglas* burden-shifting framework. *Arnone v. Town of Enfield*, 831 A.2d 260, 266 (Conn. App. 2003) ("[W]histle-blowing claims for retaliatory discharge typically invite analysis under the framework first established in *McDonnell Douglas*."). As such, the plaintiff must establish a *prima facie* case of retaliation by demonstrating that: (1) she engaged in activity protected by § 31-51m; (2) she was subsequently terminated from her employment; and (3) a causal connection exists between her participation in the protected activity and her termination. *Fasoli v. City of Stamford*, 64 F. Supp. 3d 285, 295–96 (D. Conn. 2014). If Ms. Blue meets this initial burden, the City must produce evidence of a nonretaliatory reason for the termination. *Arnone*, 831 A.2d at 266. Then, to survive summary judgment, Ms. Blue "must offer some significantly probative evidence showing that the [City's] proffered reason is pretextual." *Id*. at 267.

**1. Prima Facie Case**

**a. Public Body**

The City argues that Ms. Blue cannot establish a *prima facie* case "because she did not report an alleged violation to a third party public body." ECF No. 77-1 at 14. I disagree. Section 31-51m offers protection to those who report violations to a "public body" and defines such a body by reference to the definition of "public agency" in subdivision (1) of section 1-200. Conn. Gen. Stat. § 31-51m(b) & (a)(4). Section 1-200 defines "public agency" as any "executive,

administrative or legislative office of the state or any political subdivision of the state and any state or town agency." Conn. Gen. Stat. § 1-200(1)(A). The BOA is the legislative body for the City of New Haven, ECF No. 77-1 at 15, and therefore falls within the definition of "public body."

The City relies on *Cubilla v. Town of Montville*, 2014 WL 1565899 (Conn. Super. Mar. 18, 2014) to argue that the report must be made to a third party and the BOA does not qualify as a third party. ECF No 77-1 at 14-15. In *Cubilla*, however, "the plaintiff was reporting to the mayor her concerns about the decision, policy, plan or proposed action of the mayor himself." *Cubilla v. Town of Montville*, 2014 WL 1565899, at *2 (Conn. Super. Mar. 18, 2014). The *Cubilla* court explained that the "whistle must be blown" to a party other than "the individual supervisor of the employee about whose decision, policy, plan, action or proposed action the employee is concerned." *Id*. The present case is distinct from *Cubilla*, because Ms. Blue was not terminated after she reported the alleged violation to the person whose action concerned her, Ms. Okafor, or to her supervisor, Mayor Harp. Rather, she was terminated shortly after she reported her concerns to the BOA, which, as noted, is a public body for purposes of § 31-51m.

### b. Causation

The City next argues that there is no evidence of a causal connection between Ms. Blue's termination and her alleged protected activity. ECF No. 77-1 at 15. I disagree. To establish a causal connection, Ms. Blue "must show that the protected action was a motivating factor for employer retaliation, but not necessarily the only factor." *Karagozian v. Luxottica Retail N.A.*, 147 F. Supp. 3d 23, 33 (D. Conn. 2015) (internal quotation marks and citations omitted). She may do so "indirectly, by circumstantial evidence, such as by showing that the protected activity was followed closely in time by adverse treatment in employment." *Fasoli v. City of Stamford*,

64 F. Supp. 3d 285, 297 (D. Conn. 2014); *see also Cifra v. G.E. Co.*, 252 F.3d 205, 217 (2d Cir. 2001) (internal quotation marks and citations omitted) ("The causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.").

In this case, Ms. Blue was terminated just a few weeks after submitting her memorandum—which reported Ms. Okafor's violation, among other things—to the BOA. ECF No. 79-1 at ¶¶ 32, 42, 47 & 48. Courts in this circuit "have declined to draw a 'bright line' defining the outer limits beyond which causation based on temporal proximity may be established," *Bierce v. Town of Fishkill*, 656 Fed. Appx. 550, 552 (2d Cir. 2016), but this case falls well within the outer limits, *see Cifra*, 252 F.3d at 217 (finding a twenty-day lapse sufficient to constitute indirect evidence of causation); *Bierce*, 656 Fed. Appx. At 552 (same based on a few-month lapse); *Gorman-Bakos v. Cornell Co-op Extension of Schenectady County*, 252 F.3d 545, 555 (2d Cir. 2001) (same based on five-month lapse). Moreover, the discussion in the memorandum was the first time Ms. Blue reported Ms. Okafor's violations to a public body. ECF No. 79 at 10. All previous complaints about Ms. Okafor's practices had been made within the Mayor's administration; Ms. Blue had expressed concern about Ms. Okafor's use of unbid third-party grant writing services to others in the administration since 2014, ECF No. 79-1 at ¶ 18, yet Mayor Harp did not take adverse action against her until she sent the memorandum to the BOA. This permits an inference of causation and is sufficient to show a *prima facie* case as to causation.

There are also genuine issues of material fact as to which components of the memorandum—the parts discussing Ms. Okafor's violations or the parts disagreeing with the Mayor's budget—led to Ms. Blue's termination. Indeed, this is a complicated issue of fact

because the two components are woven together throughout the memorandum: Ms. Blue referred to Ms. Okafor's violations in the memorandum to encourage the BOA to fund two positions in her department—in contravention of the Mayor's budget. Defendant's Ex. R at 7 (Ms. Blue's memorandum to the BOA states: "I encourage this Committee not to reward repeated, willful and knowing violations of city policies and questionable consulting services investments with an increased 'fund development' contract budget for the Community Services Administration."). The fact that the whistle-blowing speech was so closely tied to speech that could form a legitimate basis for termination also raises a question of material fact regarding causation.

Especially because the Court must draw all reasonable inferences in Ms. Blue's favor at this stage, the temporal proximity of Ms. Blue's public disclosure to her termination, together with the close connection between the protected speech and the speech that could form a legitimate basis for termination, raise genuine issues of material fact and satisfy Ms. Blue's burden to establish a *prima facie* case on the causation element.

### 2. *Non-Retaliatory Reason for Termination*

In response to Ms. Blue's claim, the City has provided a legitimate, non-retaliatory reason for terminating her. The City states that Mayor Harp issued a directive to her department heads and coordinators informing them that when she submits a proposed budget to the BOA, the time for lobbying in favor of a particular department is over, and they must support the budget before the BOA. ECF No. 79-1 at ¶ 34. Ms. Blue states that the directive was not clearly communicated, but she admitted at her deposition that she was aware of it. ECF No. 79-1 at ¶ 38; Defendant's Ex. A at 114-15.

The parties agree that Ms. Blue's memorandum to the BOA included an appeal for two new positions in her department despite those positions not being included in the Mayor's

budget. ECF No. 79-1 at ¶¶ 33, 37. In addition, the parties agree that at the termination meeting, Mayor Harp "indicated that if Blue had wanted to advocate for new positions, the time to do so was before the budget was submitted, and that Blue's April 7th request for the new positions was a deliberate violation of her directive to speak with one voice, and that she had disrupted the operations of her office and the budget process." *Id.* at ¶ 44. Finally, Ms. Blue agrees with the City that Mayor Harp terminated her employment "for violating her trust and for deliberately disobeying a directive that disrupted the operations of her office and the budget process." *Id.* at ¶ 47. This is a non-retaliatory and legitimate reason for terminating Ms. Blue. Thus, to survive summary judgment, Ms. Blue must produce some evidence that this reason was pretext.

### 3. Pretext

Once a defendant articulates a legitimate, non-retaliatory reason for the adverse employment action, the plaintiff has "an opportunity to show that the reason was merely a pretext for retaliation." *LaFond v. Gen. Physics Services Corp.*, 50 F.3d 165, 173 (2d Cir. 1995). At this stage, "the evidence that a plaintiff presented in support of her prima facie case *may* be sufficient to satisfy her ultimate burden of proof," although "that will not necessarily be the case." *Perez-Dickson v. City of Bridgeport*, 304 Conn. 483, 517 (Conn. 2012); *see also Craine v. Trinity College*, 259 Conn. 625, 644 (Conn. 2002) (explaining that "[a]lthough the presumption created by the prima facie case disappears, the plaintiff may rely upon the evidence used in establishing the prima facie case to prove the ultimate issue" in a sex-discrimination case analyzed under the *McDonnell-Douglas* burden-shifting framework); *LaFond*, 50 F.3d at 174 ("Pretext may be demonstrated either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, or by reliance on the evidence comprising the prima facie case, without more.") (internal quotation marks and citation omitted).

Here, Ms. Blue relies on the evidence in her *prima facie* case, specifically noting that she reported a violation of city rules to the BOA, was terminated shortly thereafter, and had never before received negative feedback about her job performance. ECF No. 79 at 11. I find that the content of the memorandum, namely the close connection between the whistle-blowing speech and the unprotected speech, together with the temporal proximity between publication of the memo and Ms. Blue's termination, raise a genuine issue of material fact to be tried in this case. Based on this evidence, a reasonable juror could conclude that Ms. Blue was terminated because she reported Ms. Okafor's violations to a public body, despite the fact that the City provided a legitimate, non-retaliatory reason for terminating her. Accordingly, summary judgment on Ms. Blue's § 31-51m claim is DENIED.

**B.  Retaliation for Exercising Free Speech (Counts Two and Three)**

Ms. Blue alleges that she was terminated for exercising her right to free speech in violation of Conn. Gen. Stat. § 31-51q and 42 U.S.C. § 1983. Although these claims share several elements, there are important differences, and I assess each in turn.

*1.  42 U.S.C. § 1983*

In order to make out a *prima facie* claim of free speech retaliation under § 1983, Ms. Blue "must establish a prima facie case by bring[ing] forth evidence showing that [1] [s]he has engaged in protected First Amendment activity, [2] [s]he suffered an adverse employment action, and [3] there was a causal connection between the protected activity and the adverse employment action." *Smith v. County of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015) (internal quotation marks and citation omitted). The City argues that Ms. Blue cannot make out a *prima facie* case as she was not engaged in protected speech. I agree.

The applicability of the First Amendment to speech by government employees is governed by two principal inquiries. "The first requires determining whether the employee spoke

as a citizen on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. If the answer is yes, then the possibility of a First Amendment claim arises." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) (internal citations omitted). "In *Garcetti,* the Court parsed the first of the above 'two inquiries' into separate questions as to (1) whether the subject of the employee's speech was a matter of public concern and (2) whether the employee spoke 'as a citizen' rather than solely as an employee." *Jackler v. Byrne*, 658 F.3d 225, 235 (2d Cir. 2011). Here, the City argues that Ms. Blue was not engaged in protected speech because she did not speak as a citizen. ECF No. 77-1 at 18-19.

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). Thus, an employer's decision to restrict speech that stems from "a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen," and is therefore permissible. *Id.* at 421-22. In determining whether an individual spoke as a citizen, "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties." *Montero v. City of Yonkers, New York*, 890 F.3d 386, 397–98 (2d Cir. 2018) (internal quotation marks omitted).

Ms. Blue argues that she was acting as a citizen because responding to the inquiry by the BOA "was not part of her job description." ECF No. 79 at 13. However, this assertion is contradicted by her own deposition testimony:

> Q: And is it your testimony that although that request was made during Ms. Okafor's testimony, you believed it was your responsibility to respond to that inquiry, as well?

A [Ms. Blue]: Yes. I believe they said someone. Something to that effect. So I believed it was my responsibility to be the person responsive to questions about grants in the City.

Q. Okay. Even though you weren't there?

A [Ms. Blue]: Yes.

Q: All right. Why would you think that the Board of Alders [] requested you to provide that information when you weren't there?

A [Ms. Blue]: Because they specifically invoked my office and said they had confusion about my testimony in relation to Martha's testimony.

Defendant's Ex. A at 79-80. In her memorandum, Ms. Blue states that "[i]f the alders had [asked her for clarification], there would be more credence to the City's argument that Ms. Blue was doing her job, and was not acting as a citizen." ECF No. 79 at 13. But her testimony clearly states that she "believed it was [her] responsibility" to submit a memorandum responding to the BOA's concerns. Defendant's Ex. A at 79. This is further supported by Ms. Blue's allegations in the complaint, where she stated that she "submitted a memorandum to the BOA Finance Committee in response to its request" and "followed her usual practice with respect to all her reports to BOA." ECF No. 43 at ¶¶ 27-28. Finally, the memorandum itself demonstrates that she wrote it pursuant to her official duties: it is addressed from "Mendi Blue, Director of Development and Policy," and in it, Ms. Blue states that "[a]s the Director of the Office of Development and Policy . . . I believe I am in the best position to respond to [the BOA's] inquiries." Defendant's Ex. R at 1.

Ms. Blue further argues that her statements were not part of the normal course of her duties because in her memorandum to the BOA she "characterizes herself as a citizen by referencing the fact that she was born and raised in New Haven, that three generations of her family lived there, and that she has more than 100 family members still living there." ECF No. 79 at 14. However, Ms. Blue immediately follows her discussion of these ties to the City with

statements that she takes her "role as the Office's Director and a steward of taxpayer dollars seriously," and "would spend any money allocated to the Office of Development and Policy with that personal lens always in mind." Defendant's Ex. R at 11. Thus, Ms. Blue referenced her family's history in New Haven to bolster her request for funding—a request that she made in her professional capacity as Director of Development and Policy rather than as a citizen. *Id*. at 1. Moreover, as both parties recognize, Ms. Blue was required by ordinance to provide quarterly reports to the BOA about her office's performance. ECF No. 77-1 at 19; ECF No. 79 at 13. And in her role as Director of Development and Policy, she testified before the BOA Finance Committee and answered questions about grants and the sources of funding she brought into the City. ECF No. 79-1 ¶ 29. Thus, the record makes clear that speech to the BOA about grant funding is exactly the type of speech "ordinarily within the scope of [Ms. Blue's] duties." *Montero*, 890 F.3d at 397-98.

As such, there is no genuine dispute that the memorandum containing the allegedly-protected speech was written in the course of Ms. Blue's duties, and not as a citizen. Because the City is entitled to judgment as a matter of law on this issue, summary judgment as to Count Three is GRANTED.

### 2. *Conn. Gen. Stat. § 31-51q*

An employer violates Conn. Gen. Stat. § 31-51q when it discharges an employee "on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer." To establish a *prima facie* claim, Ms. Blue must establish: "(1) that [s]he engaged in constitutionally

protected speech, (2) that h[er] employer took an adverse action against h[er], and (3) that there was a causal relationship between the protected activity and the adverse action." *Karagozian*, 147 F. Supp. 3d at 35.

Further, the framework set forth in *McDonnell Douglas* applies. *Perez-Dickson v. Bridgeport Bd. of Educ.*, 2016 WL 7742923, at *3 (Conn. Super. Dec. 5, 2016) (explaining that the *McDonnell Douglass* framework "applies to free speech retaliation claims made pursuant to §§ 1981, 1983, and 31–51q"); *see also Fasoli*, 64 F. Supp. 3d at 296 ("[A]lthough the evidentiary framework for analyzing First Amendment retaliation claims under § 1983 and Conn. Gen.Stat. § 31–51q is not expressly referred to in the case law as falling under the *McDonnell Douglas* rubric, it is still essentially the same."). Under this framework, the City must produce evidence of a nonretaliatory reason for the termination, and then the burden shifts back to Ms. Blue to "produce evidence from which a reasonable jury could find that the employer's stated reason is merely pretext for illegal retaliation." *Perez-Dickson*, 2016 WL 7742923, at *3 (internal citation omitted).

The Court must also consider whether the protected activity "substantially or materially interfere[d] with [Ms. Blue's] bona fide job performance or the working relationship between [Ms. Blue] and [the City]." Conn. Gen. Stat. § 31-51q.

Finally, the City may avoid liability if it can show that it would have terminated Ms. Blue in the absence of protected conduct. *Karagozian*, 147 F. Supp. 3d at 38.

### a. Prima Facie Case

The City does not contest the second element of the *prima facie* case, but it argues that Ms. Blue did not engage in constitutionally protected speech and that she failed to establish the requisite causal relationship. ECF No. 77-1 at 17.

i. <u>Protected Speech</u>

The City argues that Ms. Blue was not engaged in protected speech because she submitted the memorandum "as part of the normal course of her duties" and "was acting in her own self-interest." ECF No. 77-1 at 19. This argument is unavailing as applied to Ms. Blue's § 31-51q claim. The Connecticut Supreme Court has held that the *Garcetti* framework, discussed above in relation to the First Amendment, does not apply to claims arising under the state constitutional provisions referred to in § 31-51q because "precedent favors a broader reading of the free speech provisions of the state constitution than of the first amendment." *Trusz v. UBS Realty Inv'rs, LLC*, 319 Conn. 175, 205 (Conn. 2015). Under the Connecticut Constitution, "even when an employee speaks pursuant to her official duties, the employee's speech will be protected so long as it is a comment on official dishonesty, deliberately unconstitutional action, other serious wrongdoing, or threats to health and safety." *Brown v. Off. of State Comptroller*, 211 F. Supp. 3d 455, 478 (D. Conn. 2016) (internal quotation marks omitted), *aff'd in part, appeal dismissed in part sub nom, Brown v. Halpin*, 885 F.3d 111 (2d Cir. 2018). "The fact that the alleged violation of the law is regulatory or civil, not criminal, does not prevent it from being considered a 'serious wrongdoing.'" *Id.*

In this case, Ms. Blue's memorandum made allegations about Ms. Okafor's improper contracting of unbid work to a vendor. ECF No. 43 at 8. This concerns both a violation of the City Charter and the management of taxpayer money—which is enough to make it "serious wrongdoing." Thus, it is protected by the Connecticut Constitution even though Ms. Blue was speaking pursuant to her official duties. *Brown*, 211 F. Supp. 3d at 478 ("Examples of official dishonesty and/or serious wrongdoing include: 'when . . . a public auditor speaks on his discovery of embezzlement of public funds, when a building inspector makes an obligatory

report of an attempt to bribe him, or when a law enforcement officer expressly balks at a superior's order to violate constitutional rights he is sworn to protect.'") (quoting *Trusz*, 319 Conn. at 199). Here, because the speech concerns serious wrongdoing and is sufficiently serious as a matter of law, summary judgment is not warranted on this ground.

      ii.   <u>Causation</u>

The City next argues that Ms. Blue cannot establish the requisite causal connection. ECF No. 77-1 at 19-20. I disagree for the same reasons discussed above in Section III.A.1.b.

**b. Non-Retaliatory Reason for Termination**

As discussed above in Section III.A.2, the City has provided a legitimate, non-retaliatory reason for terminating Ms. Blue. Thus, Ms. Blue must produce some evidence that this reason was pretext.

**c. Pretext**

As discussed above in Section III.A.3, the temporal proximity of Ms. Blue's disclosure to her termination, together with the close connection between the protected speech and unprotected speech, raise genuine issues of material fact. Based on this evidence, a reasonable juror could conclude that Ms. Blue was terminated because of her protected speech regarding Ms. Okafor's alleged violations, despite the fact that the City provided a legitimate, non-retaliatory reason for terminating her.

**d. Interference with Job Performance or Working Relationship**

The next inquiry under § 31-51q is whether Ms. Blue's exercise of her rights "substantially or materially interfere[d] with [her] bona fide job performance or the working relationship between [her] and [the City]." Conn. Gen. Stat. § 31-51q. "Connecticut Courts apply the balancing test the Supreme Court set out in *Pickering v. Board of Education* to assess

whether this prong has been met." *Karagozian*, 147 F. Supp. 3d at 37 (internal citations omitted). The balancing test requires the Court to weigh "the extent of the disruption caused by the employee's speech on [1] workplace discipline, [2] harmony among co-workers, [3] working relationships, [4] the employee's job performance, [5] the responsibilities of the employee within the agency and [6] whether the speech is made publicly or privately." *Schumann v. Dianon Sys., Inc.*, 304 Conn. 585, at 623-24 (Conn. 2012). Under this balancing test, "the ultimate question is whether the employee's right to speak is outweighed by the public employer's interest in the effective operation of the workplace." *McEvoy v. Spencer*, 124 F.3d 92, 98 (2d Cir. 1997).

In the absence of binding precedent, state and federal trial courts have split on whether the plaintiff or the defendant bears the burden at this step. *Matthews v. Dept. of Pub. Safety*, 2013 WL 3306435, at *8 (Conn. Super. May 31, 2013) (noting that "no appellate authority has weighed in on this issue"). Although the majority approach places the burden on the plaintiff, *see Buscetto v. St. Bernard Sch. of Montville, Inc.*, 2013 WL 1111582, at *6 (Conn. Super. Feb. 22, 2013) (collecting cases), I predict that the Connecticut Supreme Court would place the burden on the defendant for substantially the same reasons set forth by Judge Peck in *Matthews v. Department of Public Safety*:

> [I]f [the plaintiff] w[as] required to prove a lack of a substantial and material interference, he would be forced to prove a negative, which is a difficult if not impossible task. This would place the court in the peculiar position of requiring the plaintiff to plead either an extensive and exhaustive recitation of all events that may have involved interference or a boilerplate that would not give significant factual detail and would likely involve a legal conclusion In contrast, by placing the burden on the defendant to plead a substantial and material interference as a special defense, the defendant is able to allege specific facts concerning any incidents of disruption because, as the employer, it has a wider and better knowledge of disruptive events. This creates a situation well suited for an affirmative defense, and, in light of the case law, interpretation of the statutory text and confines of logic, it makes more sense that it is the defendant's burden to prove a substantial and material interference.

*Matthews*, 2013 WL 3306435, at *10 (internal citation and footnote omitted); *see also Travelers Ins. Co. v. 633 Third Associates*, 14 F.3d 114, 119 (2d Cir. 1994) ("Where the substantive law of the forum state is uncertain or ambiguous, the job of the federal courts is carefully to predict how the highest court of the forum state would resolve the uncertainty or ambiguity."). In addition, as noted by Judge Peck, the placement of the "substantial[] or material[] interfere[ence]" language in the statute after a comma and after the word "provided," *see* Conn. Gen. Stat. § 31-51q, is at least consistent with the notion that the General Assembly intended that a showing of substantial or material interference be an affirmative defense. *Id.*

In the present case, the City argues that Ms. Blue's speech was unduly disruptive of her employment with the City, but does not cite any evidence to support this argument. First, the City asserts that there was "*potential for disruption* to the Mayor's office and the City's budgetary process" in light of Ms. Blue's close working relationship with the Mayor and the position of trust that she occupied. ECF No. 77-1 at 22 (emphasis added). Second, the City asserts that there was "actual disruption to the City's operations" since "Mayor Harp was forced to field questions from the media regarding the matter and to defend her budget." *Id.* The City does not cite an affidavit from the Mayor or any other evidence to support these arguments.

Although the City does not point to this language, the Court notes that the termination script does include the following language about disruption to the Mayor's office:

> 7. You have caused disruption in the operations of this office and in its orderly dealings with the budget process.
>
> Your actions—taken in the face of your obligations to me and in the face of what you know and acknowledge to be the plain, stated rules—was, in my opinion, intended to disrupt the orderly course of operations of the budget process; to cause me embarrassment. . . all for your own personal gain or aggrandizement.
>
> You knew that what you did would likely interfere with the Administration's—with my—governmental operations and relationships.

8. I am thoroughly and completely disappointed by, and at a complete loss to understand or explain, your considered and deliberate violation of the reasonable rules and policies for ensuring orderly governmental operations and am personally offended by this breach or [sic] trust.

Defendant's Ex. U. However, all of these statements are conclusory and there are no specific facts evidencing incidents of disruption or interference. *See Matthews*, 2013 WL 3306435, at *10 (explaining that the burden is placed on the defendant to plead a substantial and material interference as a special defense because "the defendant is able to allege *specific* facts concerning any incidents of disruption") (emphasis added).

In addition, the temporal proximity between Ms. Blue's termination and her protected speech counsels against granting summary judgment on the basis that her speech interfered with her job performance or working relationships. *See Algarin v. LB & O, LLC*, 2017 WL 3879306, at *3 (Conn. Super. July 19, 2017) (finding that the protected "speech did not interfere with [the plaintiff's] employment because he was notified that he was to be discharged the same day as his speech"); *see also Schulz v. Auto World, Inc.*, 2016 WL 7135040, at *9 (Conn. Super. Oct. 25, 2016) ("This court is persuaded that the employee's failure to plead that his speech did not materially interfere with [his] job performance or [his] working relationship with the [employer] is not fatal to stating a claim upon which relief may be granted under § 31–51q given that he alleges that he was terminated immediately after the speech was made.") (internal quotation marks omitted).

Thus, the City has not met its burden of showing that Ms. Blue's speech "substantially or materially interfere[d] with [her] bona fide job performance or the working relationship between [her] and the [City]," Conn. Gen. Stat. § 31-51q, thereby making summary judgment inappropriate on this ground.

### e. Termination in the Absence of Protected Speech

Finally, "[u]nder *Mount Healthy*, if the defendant can show that [s]he would have taken the adverse employment action, even in the absence of plaintiff's protected conduct, summary judgment is warranted." *Karagozian*, 147 F. Supp. 3d at 38. In establishing this defense, the defendant "may not rely solely on the occurrence of unprotected misconduct: [it] must also articulate and substantiate a reasonable link between that misconduct and [its] *specific* adverse actions." *Smith*, 776 F.3d at 125. Showing that the defendant "might have or could have" taken adverse action on legitimate grounds is insufficient. *Zehner v. Jordan-Elbridge Bd. of Educ.*, 666 Fed. Appx. 29, 32 (2d Cir. 2016) (unpublished). "The unprotected conduct, standing alone, must justify the adverse actions." *Smith*, 776 F.3d at 122.

In this case, the City summarily states that "Mayor Harp would have terminated Blue's employment irrespective of the claimed protected speech regarding Okafor," ECF No. 77-1 at 20, without citing an affidavit from the Mayor or any other evidence suggesting that the unprotected conduct "standing alone" would have led to the termination. Moreover, as discussed above, the protected speech was closely tied to the unprotected speech, Defendant's Ex. R at 7, and the memorandum's publication was close in time to Ms. Blue's termination, ECF No. 79-1 at ¶¶ 33, 41, 42. These factors raise a genuine issue of material fact concerning the Mayor's motivations in terminating Ms. Blue and, viewing the evidence in the light most favorable to Ms. Blue, a reasonable jury could infer that she was terminated because of the protected conduct and would not have been terminated in its absence. This precludes summary judgment. *Smith*, 776 F.3d at 125 ("Summary judgment is precluded where questions regarding an employer's motive predominate in the inquiry regarding how important a role the protected speech played in the

adverse employment decision.") (internal quotation marks, citation, and alteration omitted).

Accordingly, summary judgment on the § 31-51q claim is DENIED.

### C. Breach of Contract (Count Four)

Ms. Blue alleges that the City's decision to terminate her employment without providing her progressive discipline was in breach of her employment contract. ECF No. 43 at 9. The City argues that Ms. Blue did not have an agreement with the City that required progressive discipline; that, even assuming there was such an agreement, there was no breach; and that, in any case, the alleged agreement would be trumped by the City Charter. ECF No. 77-1 at 23.

Even assuming that the Employee Handbook constitutes an agreement and the City Charter did not trump the provisions in the handbook, as Ms. Blue alleges, the breach of contract claim fails. Although the handbook states that "[n]ormally, discipline will be administered in accordance with the principles of progressive discipline," ECF No. 79-1 at ¶ 6, such discipline was by no means guaranteed. Indeed, the Employee Handbook also states: "In some situations, employee behavior is so serious that immediate termination is warranted. If the City's investigation of the situation reveals that the employee committed what it determines to be a serious offense, then termination without progressive discipline may be required." *Id.*

"Where the language of the [writing] is clear and unambiguous, the [writing] is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity." *19 Perry St., LLC v. Unionville Water Co.*, 294 Conn. 611, 623 (Conn. 2010). Moreover, "any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms." *Connecticut Light and Power Co. v. Lighthouse Landings, Inc.*, 279 Conn. 90, 109 (Conn. 2006) (internal quotation marks and citations omitted). Here, there is no ambiguity that while

progressive discipline was "normal[]," there were circumstances in which immediate termination was permitted. Thus, Ms. Blue was not contractually entitled to progressive discipline in all circumstances. Furthermore, as the City notes, Ms. Blue does not respond to the City's argument that the Employee Handbook includes language authorizing immediate termination and therefore there was no breach. ECF No. 81 at 8. Accordingly, summary judgement is GRANTED as to Count Four, and I do not reach the City's remaining arguments concerning Ms. Blue's breach of contract claim.

### D. Race Discrimination (Counts Five and Six)

Ms. Blue alleges racial discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Connecticut Fair Employment Practices Act ("CFEPA"). ECF No. 43 at 9-12. Connecticut courts "look to federal law for guidance on interpreting state employment discrimination law, and the analysis is the same under both." *Feliciano v. Autozone, Inc.*, 316 Conn. 65, 73 (Conn. 2015). For both claims, Ms. Blue must show "that (1) [she] is a member of a protected class; (2) [she] was qualified for the position; (3) [she] suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances that give rise to an inference of discrimination." *Id*. Then, under the *McDonnell Douglas* framework, the City may show a nondiscriminatory justification for the termination. *Id*. at 74. To succeed on her claim, Ms. Blue must then demonstrate that the nondiscriminatory reason is a pretext and her termination was motivated by bias. *Id*.

#### 1. *Prima Facie Case*

The parties agree that Ms. Blue meets the first three components of her *prima facie* case, but the City argues that she cannot establish an inference of discriminatory intent. ECF No. 77-1 at 25-27. I disagree.

An inference of discrimination may be drawn from a "showing of disparate treatment—that is, a showing that the employer treated [the] plaintiff less favorably than a similarly situated employee outside h[er] protected group." *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (internal quotation marks and citation omitted). The comparators "must be similarly situated in all material respects," *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997), but what constitutes "all material respects" "varies somewhat from case to case," *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000). "An employee is similarly situated to co-employees if they were (1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct." *Ruiz v. County of Rockland*, 609 F.3d 486, 493–94 (2d Cir. 2010) (internal quotation marks and citations omitted). "The allegedly similarly situated person's conduct need not be identical to the plaintiff's, but must have 'a reasonably close resemblance.'" *Westry v. Stamford Bd. of Educ.*, 2018 WL 4054881, at *5 (D. Conn. Aug. 24, 2018) (quoting *Graham*, 230 F.3d at 40). "Although 'similarly situated' is generally a question of fact for the jury, a court can make the determination on a motion for summary judgment if the plaintiff fails to raise a genuine issue of material fact." *Westry*, 2018 WL 4054881, at *5.

In this case, Ms. Blue offers four comparators—Dean Esserman (Police Chief), Matthew Nemerson (Economic Development Administrator), Garth Harries (former Superintendent of Schools), and Doug Hausleden (Director of Public Transportation, Traffic, and Parking)—who are all white men. I find that Dean Esserman and Garth Harries are not appropriate comparators as a matter of law, and that Ms. Blue may not rely on Doug Hausleden for purposes of summary judgment.

First, Ms. Blue was "subject to removal at the pleasure of the Mayor," and therefore faced a markedly different standard for discipline and termination than both Mr. Esserman and

Mr. Harries. ECF No. 43 at ¶¶ 4 & 7. Mr. Esserman could be removed only for just cause. *Id*. at ¶ 53. Although Ms. Blue seeks to minimize this difference by arguing that Mayor Harp "could have set in motion the process by which Esserman would have been terminated if she had chosen to," ECF No. 79 at 21, her argument is unavailing. The difference between just cause protection and serving at the pleasure of the mayor is important in determining whether two individuals are similarly situated. *See Senese v. Longwood C. Sch. Dist.*, 330 F. Supp. 3d 745, 767 (E.D.N.Y. 2018) (explaining that "any similarly situated employee would have to be a probationary employee" because a "probationary employee is subject to being disciplined or terminated in a fundamentally different manner than permanent employees"); *Graham*, 230 F.3d at 42 (explaining that "to be similarly situated, [the comparators] must have been subject to the same disciplinary standards"). Similarly, Mr. Harries was subject to a significantly different removal process than Ms. Blue. As Ms. Blue explained during her deposition, Mayor Harp "didn't independently supervise [Mr. Harries]" and it was the Board of Education that had the power to remove him from his position. Defendant's Ex. A at 192-93.

Ms. Blue also fails to show that Mr. Esserman's or Ms. Harries' conduct bears a "reasonably close resemblance" to her conduct. *Graham*, 230 F.3d at 40. Mr. Esserman was involved in two serious incidents. First, in September 2014, he verbally abused an usher at a Yale football game when the usher asked to see his tickets. ECF No. 43 at ¶ 29. Mayor Harp sent Mr. Esserman a letter of reprimand in relation to this incident. *Id*. at ¶ 30. Second, in July 2016, Mr. Esserman verbally berated a waitress and disrupted other patrons in the restaurant. *Id*. at ¶¶ 33-34. Mayor Harp gave Mr. Esserman a "15-day paid sabbatical" in response to this incident. *Id*. at ¶ 34. As to Mr. Harries, Ms. Blue explains in her deposition that "[i]t was widely believed that [Mr. Harries] wasn't acting in the best interest of the City. Many parents and community

members weren't happy with his performance. Probably the most egregious thing is the multi-million dollar deficit he was running." Plaintiff's Ex. 9 at 193. While Mr. Esserman and Mr. Harries may have acted in ways that were embarrassing to Mayor Harp and her administration, their conduct was vastly different from Ms. Blue's conduct, which included "deliberately disobeying a directive," *id*. at ¶ 47, and undermining the Mayor's budget proposal, Defendant's Ex. R.

Finally, Ms. Blue argues that Mr. Esserman's conduct was "far more egregious and damaging than [her] actions." ECF No. 79 at 21. While Ms. Blue can rely on evidence that Mr. Esserman and Mr. Harries committed different but more serious offenses to prove discrimination, "[t]he determination that two acts are of comparable seriousness requires—in addition to an examination of the acts—an examination of the context and surrounding circumstances in which those acts are evaluated." *Graham*, 230 F.3d at 40. Here, as described above, Mr. Esserman and Mr. Harries were subject to very different discipline standards and engaged in very different conduct. They were not "similarly situated in all material respects," *Shumway*, 118 F.3d at 64, nor did their conduct bear "a reasonably close resemblance" to Ms. Blue's conduct, *Graham*, 230 F.3d at 40.

Ms. Blue also offers Mr. Hausleden as a comparator, but the sham affidavit doctrine precludes any consideration of whether he is similarly situated to Ms. Blue. This doctrine "prohibits *a party* from defeating summary judgment simply by submitting an affidavit that contradicts the party's previous sworn testimony." *Moll v. Telesector Resources Group, Inc.*, 760 F.3d 198, 205 (2d Cir. 2014) (internal quotation marks and citation omitted) (emphasis in original). "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly

diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Hayes v. New York City Dept. of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996). This doctrine applies to facts that contradicted previous deposition testimony "by omission or addition." *Ibid*.

Ms. Blue mentions Mr. Hausleden for the first time in her supplemental response and accompanying affidavit. ECF No. 80 and 80-1. These filings came after the City filed its motion for summary judgement and after Ms. Blue submitted her response. In the affidavit, Ms. Blue states that Mr. Hausleden and Mayor Harp had a dispute over bike usage in New Haven, but that Mayor Harp told her she could not terminate Mr. Hausleden because he is a white male and would help her with the white vote in the East Rock neighborhood. ECF No. 80-1 at ¶¶ 1 & 2. The City notes that Ms. Blue "testified at length about the basis for her race and color discrimination claims, yet she never once mentioned any conversations with Mayor Harp [until she submitted affidavits following the City's motion for summary judgment] wherein Harp allegedly referenced the race of employees in discussing whether or not to terminate their employment." ECF No. 81 at 5. During her deposition, Ms. Blue was asked to list "every employee" who she believed "engaged in more egregious behavior but was afforded progressive discipline." ECF No. 82 at 3. She was later asked, twice, whether she had "any other evidence to base [her] claim of race and or color discrimination." *Id*. at 13, 16. Despite these opportunities, she did not mention Mr. Hausleden at any point during her deposition. Thus, her affidavit contradicts her deposition testimony by omission, and "factual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." *Hayes*, 84 F.3d at 619.

The fourth and final individual Ms. Blue offers as a comparator is Matthew Nemerson. Mr. Nemerson serves as the Economic Development Administrator in Mayor Harp's

administration. ECF No. 79 at 22. Unlike the individuals discussed above, Mr. Nemerson is similarly situated to Ms. Blue and the comparison supports an inference of discrimination. The New Haven City Charter provides that the Mayor has the power to appoint Department Heads. ECF No. 78-8 at 1. Therefore, as the Economic Development Administrator, Mr. Nemerson likely served at the pleasure of the Mayor, *Id*. at 3 ("The Mayor shall appoint . . . other employees in the Office of the Mayor, who shall serve under the direction of and subject to removal at the pleasure of the Mayor."), and was "subject to the same performance evaluation and discipline standards" as Ms. Blue, *Ruiz*, 609 F.3d at 493–94 (internal quotation marks and citations omitted).

Furthermore, in her deposition, Ms. Blue states that Mayor Harp "would talk a lot about the fact that [Mr. Nemerson] would represent himself in ways that were not consistent with her views." ECF No. 82 at 12. Specifically, Ms. Blue said that the Mayor's platform was focused on "economic development in the neighborhood of New Haven," but Mr. Nemerson "primarily only focused on downtown." *Id*. While this conduct is not identical to Ms. Blue's conduct, it is sufficiently similar as both Ms. Blue and Mr. Nemerson publicly disagreed with Mayor Harp's public stance on an issue. *See Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230 (2d Cir. 2014) ("[C]ircumstances must bear a reasonably close resemblance, but need not be identical."); *Westry*, 2018 WL 4054881, at *5 (quoting *Graham*, 230 F.3d at 40) ("The allegedly similarly situated person's conduct need not be identical to the plaintiff's, but must have 'a reasonably close resemblance.'"). Here, I find that there is enough resemblance to raise an issue of fact for the jury.

Mr. Nemerson was placed on an unpaid leave of absence. ECF No. 80-1 at ¶ 4. Because Mr. Nemerson is similarly situated to Ms. Blue, and he was placed on leave instead of being terminated, Ms. Blue has met her burden in establishing a *prima facie* case.

### 2. *Non-Discriminatory Reason for Termination*

As discussed above in Section III.A.2, the City has provided a legitimate, non-discriminatory reason for terminating Ms. Blue. Thus, to survive summary judgment, Ms. Blue must produce some evidence that this reason was pretext.

### 3. *Pretext*

Once the defendant "has produced evidence that it acted for a non-discriminatory reason, [the plaintiff] may no longer rely on the presumption of discrimination raised by the prima facie case." *Holcomb v. Iona College*, 521 F.3d 130, 141 (2d Cir. 2008). The question becomes "whether, without the aid of the presumption, [the plaintiff] has raised sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence that the decision to fire [her] was based, at least in part, on [protected activity]." *Id*. At this stage, "the evidence that a plaintiff presented in support of her prima facie case *may* be sufficient to satisfy her ultimate burden of proof," although "that will not necessarily be the case." *Perez-Dickson v. City of Bridgeport*, 304 Conn. 483, 517 (Conn. 2012); *see also LaFond*, 50 F.3d at 174 (internal quotation marks and citation omitted) ("Pretext may be demonstrated either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, or by reliance on the evidence comprising the prima facie case, without more.")

Here, Ms. Blue largely relies on her prima facie case, specifically, the assertion that Mayor Harp did not terminate a white man when he publicly disagreed with her, but did terminate Ms. Blue for similar conduct. ECF No. 79 at 25-26. At the summary judgment stage,

"the court is required to resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought." *LaFond*, 50 F.3d at 175. Drawing all inferences in Ms. Blue's favor, a reasonable juror could conclude from the evidence that she was terminated while a similarly situated white individual was not, despite the fact that the City satisfied its burden and provided a legitimate, non-retaliatory reason for terminating her.

The City correctly points out that the "same actor" inference together with the fact that Mayor Harp is also African American weigh against a finding of discrimination. *See Benedith v. Malverne Union Free Sch. Dist.*, 38 F. Supp. 3d 286, 319 (E.D.N.Y. 2014) ("[W]hen the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to [him] an invidious motivation that would be inconsistent with the decision to hire."); *Tucker v. New York City*, 2008 WL 4450271, at *5 (S.D.N.Y. Sept. 30, 2008), *aff'd*, 376 Fed. Appx. 100 (2d Cir. 2010) (unpublished) ("[A]ny inference of race discrimination is further undermined by the fact that all three superintendents under whom Tucker worked as well as three of his four direct supervisors at the DOE were also African-American."). But given that Ms. Blue has identified, at least for summary judgment purposes, a similarly situated comparator who was treated differently, she has done enough to preclude summary judgment. Accordingly, summary judgment on Ms. Blue's race discrimination claims are DENIED.

**IV.    Conclusion**

For the reasons set forth above, the City's motion for summary judgment is GRANTED IN PART and DENIED IN PART.

IT IS SO ORDERED.

/s/   MICHAEL P. SHEA
Michael P. Shea, U.S.D.J.

Dated:          Hartford, Connecticut
                January 31, 2019